**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

NORTHBROOK INDEMNITY COMPANY, etc.,

        Plaintiff,

vs.                                                    Case No. 3:07-cv-683-J-32JRK

FIRST AUTOMOTIVE SERVICE
CORPORATION, N.M., etc., et al.,

        Defendants.

_____

## <u>ORDER</u>[1]

    This case involving reinsurance of vehicle service contracts is before the Court on plaintiff's Motion To Compel Arbitration. (Doc. 31.)  The Court has considered the motion, defendants' response in opposition (Doc. 32), plaintiff's reply (Doc. 37), and numerous exhibits filed by the parties. (Docs. 31, 32, 37.)  The Court held a hearing on July 23, 2008, the record of which is incorporated herein.  (Docs. 41, 42.)

**I.**    <u>**Facts**</u>

    Northbrook Indemnity Company ("Northbrook") brought this action seeking an order requiring arbitration of the dispute in the related case in which it has been named defendant, <u>First Automotive Service Corporation, N.M., etc. et al. v.</u>

_____

    [1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it is intended to decide the motion addressed herein and is not intended for official publication or to serve as precedent.

Northbrook Indemnity Company, No. 3:07-cv-682-J-32TEM (M.D. Fla.), also pending before this Court.  In that case, First Automotive Service Corporation, N.M. ("FASC") and First Automotive Insurance Risk Retention Group Inc. ("FAIRR"), defendants here,  seek a declaratory judgment alleging they are entitled to more than $10 million from Northbrook under certain reinsurance placement slips ("Four Placement Slips").

### A.   Underlying Dispute[2]

FASC insures extended vehicle service contracts marketed by non-party company Mechanical Breakdown Protection, Inc. ("MBPI") to automobile dealers and vehicle owners.  FASC is the obligor under the MBPI vehicle service contracts, which means that it obligates itself to satisfy valid investigated claims presented to it by MBPI.  FAIRR insures FASC.  Thus, in the normal course of business, an automobile buyer purchases a vehicle service contract from MBPI, a subagent of FASC.  The buyer then submits a claim for payment to FASC for any repairs covered by the vehicle service contract.  FAIRR, in turn, insures FASC's liabilities under its vehicle service contracts.  Northbrook then provides reinsurance to FAIRR.  (See Doc. 31 at

_____

[2]   These facts are drawn from the Complaint filed by FASC and FAIRR and counterclaim filed by Northbrook in the companion case.  (3:07-cv-682-J-32TEM, Docs. 2, 8.)  Defendant First Colonial Insurance Company was dismissed from that action.  (Id. Doc. 36.)  For purposes of determining the issue of arbitration, the Court assumes that the facts alleged are true.  See Int'l Underwriters AG v. Triple I: Int'l Investments, Inc., ___ F.3d __, 2008 WL 2717182, at * 3 (11th Cir. July 14, 2008)

3.)[3]

FASC and FAIRR contend that Northbrook's reinsurance of MBPI service contracts is governed by the Four Placement Slips attached to their complaint.[4] FASC and FAIRR allege "[t]he loss reserves relating to the MBPI/FASC vehicle service contract program have been exhausted" and that FAIRR made a written demand to Northbrook for payment of its reinsurance claim, which it alleges exceeds $10 million.  FAIRR and FASC contend that the Four Placement Slips are the only

---

[3]   "In a reinsurance contract, one insurance company (the 'ceding insurer' or the 'reinsured'), cedes all or part of the risk that it has underwritten pursuant to an insurance policy or policies to another insurer (the 'reinsurer'), in return for a percentage of the premium." British Ins. Co. of Cayman v. Safety Nat'l Cas., 335 F.3d 205, 211-12 (3d Cir. 2003).

[4]   "A placement slip is also known as a cover slip [and] serves as a contract between the parties until the formal contractual documents are issued." Calvert Fire Ins. Co. v. Unigard Mut. Ins. Co., 526 F. Supp. 623, 626 n.4 (D. Neb. 1980). Placement Slips "provide an outline of the essential terms of reinsurance and act in the nature of an insurance binder, providing coverage during the pendency of negotiations between the reinsured and reinsurer." N. Carolina League of Municipalities v. Clarendon Nat'l Ins. Co., 733 F. Supp. 1009, 1010 (D.N.C. 1990). Regardless of whether a succeeding contract is issued, placement slips are treated as binding contracts. Harco Nat'l Ins. Co. v. Millenium Ins. Underwriting Ltd., No. 05 C 2397, 2005 WL 2124475, at *2 n.1  (N.D. Ill. Aug. 3, 2005).
    Counsel for FAIRR and FASC characterized the Four Placement Slips as providing "cut-through coverage."  (Doc. 42 (Tr. at 56).)  "'A "cut-through" clause is any term within a reinsurance agreement under which the reinsurer assumes liability towards the original insured in the event of the liquidation of the reinsured.'" Stanley v. Trinchard, 500 F.3d 411, 416 n.5 (5th Cir. 2007)(quoting Lee R. Russ & Thomas F. Segalla, Couch on Insurance §  9.16 (3d ed. 2006)).

documents which govern the disputed reinsurance of the MBPI service contracts, and that the Four Placement Slips and the Aggregate Excess of Loss Reinsurance Agreement ("Reinsurance Agreement"), also between FAIRR and Northbrook, represent two separate reinsurance transactions.  Northbrook argues that the dispute involves a total of nine placement slips and the Reinsurance Agreement that it says was "in place before and after the execution of the placement slips," and seeks a declaration of the parties' rights under both.  Northbrook argues that because this dispute implicates the Reinsurance Agreement, of which the Four Placement Slips are a subset, the dispute set forth in the companion case 3:07-cv-682-J-32TEM is subject to the arbitration provision in the Reinsurance Agreement.

In its complaint for declaratory judgment in Case No. 3:07-cv-682-J-32TEM (Doc. 2), FAIRR and FASC ask the Court to determine that the placement slips are valid and binding; that reinsurance coverage in favor of FAIRR attached "when 100% (one hundred percent) of all claim liabilities as presented by MBPI to FASC and FAIR exceeded the established MBPI loss reserves" and the "amounts applicable to the re-insurance coverage."

### B.    The Agreements

The Reinsurance Agreement was born out of an initial placement slip ("Initial Placement Slip"), which was executed December 28, 2000, by reinsurer Northbrook (through its agent) and FAIRR, as the reinsured.  (Doc. 31-2 at 18.)  The Initial

Placement Slip covered "Auto Warranty Contracts" approved in advance by Northbrook, and specified the reinsured's retention limit, premiums, and other requirements.  It included the phrase "Arbitration Clause" as a listed "Contract Clause," but did not further specify arbitration terms.

The Initial Placement Slip ripened into the Reinsurance Agreement between Northbrook as reinsurer and FAIRR as reinsured, which was executed on December 12, 2001.[5]  (Doc. 1 at 24.)  The Reinsurance Agreement covered

> Contractual Liability coverage provided to Dealer Obligors and Administrator Obligors[6] involved in the business of selling and/or administering Service Contracts.

(Doc. 1 at 26 (Reinsurance Agreement Art. I).)  The Reinsurance Agreement was effective from January 1, 2001 through December 31, 2001, and was renewable annually.  (Id.)  It remained in effect until January 26, 2006.  (Doc. 31-2 at 45.)  The twenty page Reinsurance Agreement was comprised of thirty-two articles with many detailed provisions.  It required FAIRR, the reinsured, to "have an aggregate retention equal to 140% of [FAIRR's] Initial Loss Reserve Premium," and required Northbrook, as reinsurer, to pay

---

[5]    After executing the Initial Placement Slip, Northbrook and FAIRR negotiated the terms of what was to become the Reinsurance Agreement.  (See Docs. 32 at 4, 8; 32-3 at 8; 32-4.)  The Reinsurance Agreement was then executed in December 2001, effective retroactively to January 2001.  (Doc. 32 at 9.)

[6]    An "Administrator Obligor" is a company that issues vehicle service contracts and has a primary responsibility to pay claims filed thereunder.  (Doc. 31 at 3.)

> all Ultimate Net Loss in excess of [FAIRR's] retention up to
> a limit equal to 40% of the Loss Reserve Premium, subject
> to the lesser of a Maximum aggregate Limit of $5,000,000,
> or 180% of the Loss Reserve Premium, for the Term.

(Doc. 1 at 26 (Reinsurance Agreement Art. II).)  The annual reinsurance premium was

set at

> [t]he greater of $5.00 per Service Contract or 1.35% of Net
> Written Premium, plus Premium Taxes, for all Service
> Contracts issued on approved programs, subject to a
> minimum annual premium of $41,000, payable quarterly in
> advance.

(Id. at 28 (Reinsurance Agreement Art. IV).)

Article XIX of the Reinsurance Agreement contains the following arbitration

provision:

> As a precedent to any right of action hereunder, if any
> differences shall arise between the contracting parties with
> reference to the interpretation of this Agreement or their
> rights with respect to any transaction involved, whether
> arising before or after termination of this Agreement, such
> differences shall be submitted to arbitration upon the written
> request of one of the contracting parties.

(Id. at 34 (Reinsurance Agreement Art. XIX).)

Article III of the Reinsurance Agreement provides that

> This Agreement constitutes the entire agreement between
> the parties hereto with respect to the subject matter hereof,
> supercedes all prior agreements, arrangements, and
> understandings relating to the subject matter hereof (if any),
> and shall not be altered or amended except by a writing
> signed by each of the parties hereto.

6

(Id. at 26 (Reinsurance Agreement Art. III).)

The Four Placement Slips cited by FAIRR and FASC specifically relate to FASC vehicle service contracts sold by MBPI and insured by FAIRR. (Doc. 1 at 15-18.)  The Four Placement Slips are identical except for the effective period covered. The first effective period was from April 23, 2001, with the remaining three placement slips covering consecutive one year periods beginning on April 1, 2002 and ending on March 31, 2005.  They were each executed by FAIRR and an agent or manager for Northbrook.  The first of the Four Placement Slips addressing the MBPI service contracts was executed May 9, 2001, four months after the parties executed the Initial Placement Slip and while negotiations were ongoing concerning the Reinsurance Agreement.

Each of the Four Placement Slips is one page,[7] naming FASC as the insured; FAIRR as the insurer; and Northbrook as the reinsurer.  They cover

> All claim liability incurred by Mechanical Breakdown Protection, Inc. (MBPI) under FASC vehicle service contracts sold by MBPI.

(Doc. 1 at 15.)  The Four Placement Slips set forth reinsurance at

> 100% of all claim liabilities that exceed the established MBPI Loss Reserves

---

[7]    Some courts have noted an "idiosyncratic laxity of documentation practices in the reinsurance business." Czarina, L.L.C. v. W.F. Poe Syndicate, 254 F. Supp.2d 1229,1233 n.8 (M.D. Fla. 2002)(citing cases).

Id., setting no cap on Northbrook's limit of liability for the MBPI business.  Further, the Four Placement Slips set premiums "per the attached base reserve rate schedule remitted monthly . . . ."  Id.  However, no attached schedule accompanied the Four Placement Slips.  The parties did not specify any other terms in the Four Placement Slips.

Key terms of the Reinsurance Agreement and the Four Placement Slips compare as follows:

| Coverage Terms and Conditions | Reinsurance Agreement | Four Placement Slips |
|---|---|---|
| **Insured** | Four Administrator Obligors | FASC (one of the Administrator Obligors) |
| **Insured Business** | Vehicle Service Contracts | MBPI Vehicle Service Contracts |
| **Term** | Jan. 1, 2001-Dec. 31, 2001 (with annual renewal; renewed to Jan. 26, 2006) | April 23, 2001-Mar. 31, 2002 April 1, 2002-Mar. 31, 2003 April 1, 2003-Mar. 31, 2004 April 1, 2004-Mar. 31, 2005 |
| **Attachment Point** | 140% of Initial Loss Reserve Premium | 100% of all claim liabilities that exceed the MBPI loss reserves |
| **Limit** | Lesser of $5 million or 180% of Loss Reserve Premium | None |
| **Premium** | $5.00/Vehicle Service Contract or 1.35% of Net Written Premium | Net Premium per base rate schedule (no schedule attached) |

FAIRR and FASC acknowledge that the Four Placement Slips provided "additional coverage over and above" that provided by the Reinsurance Agreement for the MBPI

service contracts.  (Doc. 32 at 12.)[8]

At issue here is whether the dispute arising out of the Four Placement Slips sued upon by FASC and FAIRR is covered by the arbitration provision of the Reinsurance Agreement.

### C.    Parol Evidence

The parties submitted additional evidence in support of their positions on Northbrook's motion to compel arbitration.  Northbrook offered the affidavit of Jackie Allison Banks, of Northbrook parent company The Allstate Corporation, (see 3:07-cv-682 (Doc. 10)).  Ms. Banks stated that  Northbrook received from FAIRR a premium of $5.00 per contract "on all of the business covered by the . . . Reinsurance Agreement, including contracts sold by MBPI," which is consistent with the premium amount specified in the Article IV of the Reinsurance Agreement.  (Doc. 31-2 at 60 (Banks Affidavit ¶ 6).)  Further, FAIRR's monthly reinsurance reports for the relevant period included statistics for MBPI and non-MBPI business.  (Doc. 31-2 at 99.) FAIRR's statutory basis financial statements submitted to the state of Hawaii disclosed one reinsurance for the pertinent years (Doc. 31-3.)  Additionally  FAIRR's

---

[8]   A third set of documents between the parties, referred to as the "Second Placement Slips," are a series of five one-page documents entitled FAIRR "Insurance Placement Slip," signed only by FAIRR or Dealers Assurance Company (DAC), and naming FAIRR (or DAC) as the "insurer" and Northbrook as the "insured."  (Doc. 1 at 47-51.)  Though the import of the Second Placement Slips is unclear, they will no doubt play a part in resolving the underlying dispute.

independent auditor report  dated December 31, 2006, reported  that FAIRR carried one excess reinsurance agreement for accident years 2001 through 2004, with maximum coverage of $5 million each year, and an attachment point of 140% of loss reserve premiums.

> On a certain block of business, annually separate placement slips were executed with a reinsurer so that an attachment would occur at 100% of all claim liabilities that exceed the established trusts, effectively bypassing [FAIRR's] liability on these policies.

(Doc. 31-4 at 17.)   Finally, Northbrook submitted documentation that in 2005, an attorney representing FAIRR recommended that Northbrook respond to a state of Nebraska inquiry with the statement:

> With respect to FASC's service contracts marketed through MBPI, the limit of the FAIR Reinsurance Agreement was modified to provide for reinsurance of FAIR for 100% of the claims liabilities that exceed the agreed upon loss reserves established by FASC on the MBPI business.

(Doc. 37 at 2, 11, 16, 18, 20 (emphasis added).)

FASC and FAIRR submitted the affidavit of James B. Smith, president of FASC and FAIRR, who stated that "[d]uring the first half of 2001, FASC began issuing vehicle service contracts under a new program marketed by MBPI, and MBPI requested that this program be reinsured on a facultative basis separate from the

[Reinsurance Agreement]." (Doc. 32-5 at 2 (Smith Affidavit ¶ 4).)[9]  They also submitted the affidavit of Michael T. Rogers, a managing member of non-party Risk Services, L.L.C., which acted as an intermediary in the negotiations between Northbrook and FAIRR for the Reinsurance  Agreement, but was not involved in the negotiations for the Four Placement Slips and indeed, was unaware of the Four Placement Slips until 2006.  (Doc. 32-2 at 2 (Rogers Affidavit ¶¶ 3-5).)  Rogers confirmed that the Reinsurance Agreement involved reinsurance of four Administrator Obligors insureds of FAIRR, which included FASC.  (Id. ¶ 6.)  Rogers stated that reinsurance of the MBPI service contracts through FASC "attaching at 100% of the loss reserve fund was never contemplated or even mentioned in the negotiations of the [Reinsurance Agreement] that took place throughout 2001."  (Id. ¶ 12.)[10]

---

[9]   Counsel for FAIRR and FASC stated at the hearing that the Four Placement Slips were in place because MBPI required that its insurer FAIRR not be responsible for losses with attachments between 100% (as set by the Four Placement Slips) and 140% (per the Reinsurance Agreement), and that the Four Placement Slips provided "cut through coverage."  "[T]he particular customer, MBPI, would not permit FAIRR, as an insurer, to bear an insurance liability, and required a . . .  rated insurance company like Northbrook to step in at 100 percent." (Doc. 42 (Tr. at 55-56).)  Counsel for Northbrook stated that he believes that merits discovery will establish that the terms of the Four Placement Slips were requested by MBPI, FAIRR and FASC as a tool for marketing vehicle service contracts to vehicle dealers.

[10]   Mr. Rogers further opines that the Four Placement Slips were "separate and distinct" from the Reinsurance Agreement.  However, Northbrook has moved to strike the Rogers affidavit on the basis that 1) Rogers has no personal knowledge regarding the drafting or execution of the Four Placement Slips relating the MBPI service contracts; 2) the Roger's affidavit contains inadmissible hearsay; and 3) Rogers has not been qualified to submit expert testimony.  (Doc. 35.)  FAIRR and FASC have

## II.    The Federal Arbitration Act[11]

The parties agree that when a contract contains a written arbitration clause and concerns a transaction involving commerce, the Federal Arbitration Act ("FAA"), 9 U.S.C. § § 1 et seq. applies.  See Southland Corp. v. Keating, 465 U.S. 1, 11 (1984). While there is a strong federal policy favoring arbitration as an alternative means of dispute resolution, Becker v. Davis, 491 F.3d 1292, 1298 (11th Cir. 2007), "'[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" AT&T Techs,, Inc. v. Communications Workers of America, Inc., 475 U.S. 643, 648 (1986)(citation omitted).  However, in accordance with the strong policy in favor of arbitration, where, as here, the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of

---

responded in opposition to the motion.  (Doc.38.)  The motion is **DENIED** in that the Court will not strike the Rogers affidavit, but will only consider those portions of the affidavit stating facts of which Mr. Rogers has personal knowledge.

[11]   The  arbitration  provision  in the Reinsurance Agreement, upon which Northbrook bases its motion to compel arbitration, in no way shifts the question of arbitrability of FASC and FAIRR's claims brought pursuant to the Four Placement Slips away from the Court to a panel of arbitrators, as suggested by Northbrook. (Doc. 31 at 7.)  See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 82 (2002)("The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the *'question of arbitrability,'* is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'")(quoting AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643,  649 (1986)).  There is no such "clear and unmistakable" provision here.

arbitrability.  See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1,

24-25 (1983).  When a contract contains an arbitration clause, a court should compel

arbitration unless "it may be said with positive assurance that the arbitration clause

is not susceptible of an interpretation that covers the asserted dispute." AT&T Techs.,

Inc., 475 U.S. at 650.  This presumption in favor of arbitrability is particularly

applicable where, as here, the arbitration clause is broad, in which case, "'[i]n the

absence of any express provision excluding a particular grievance from arbitration,

we think only the most forceful evidence of  a purpose to exclude the claim from

arbitration can prevail.'"  Id. (citation omitted).

        "To determine what disputes the parties agreed to arbitrate, [the Court] must

begin with the language of the applicable arbitration provision, keeping in mind 'that

any doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration.'"  World Rentals and Sales, LLC v. Volvo Const. Equipment Rents, Inc.,

517 F.3d 1240, 1245 (11th Cir. 2008)(quoting Klay v. All Defendants, 389 F.3d 1191,

1201 (11th Cir. 2004).  "[I]f allegations underlying claims 'touch matters' covered by

the parties' arbitration agreement, then claims must be arbitrated, whatever legal

labels are attached to them." Industrial Risk Insurers v. M.A.N. Gutehoffnungshütte,

141 F.3d 1434, 1448 n.21 (11th Cir. 1998);  see also Medallion Homes Gulf Coast,

Inc. v. Gevorgyan, No. 8:07-cv-246-T-23TBM, 2007 WL 947895, at *2 (M.D. Fla.

March 27, 2007)(citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473

U.S. 614, 622 n.9, 624 n.13 (1986)).

## III.   **Discussion**

FAIRR does not dispute that it made a valid and enforceable agreement to arbitrate in the Reinsurance Agreement.  Rather, its position is that the claims in dispute are independent of the Reinsurance Agreement and arise solely out of the obligations found in the Four Placement Slips, which do not include an arbitration provision.  Northbrook counters that resolution of the dispute over what is owed under the Four Placement Slips requires interpretation of the Reinsurance Agreement. Because the parties concur that an agreement to arbitrate disputes exists between them, the Court looks to the scope of that agreement and then determines whether FAIRR and FASC's claims fall within that scope.

The Eleventh Circuit acknowledges that "an arbitration clause in an agreement sometimes can require arbitration of a dispute arising not from the agreement itself but from another source, including another agreement . . . when the arbitration clause applies to the dispute at issue." Int'l Underwriters AG v. Triple I: Int'l Investments, Inc., ___ F.3d ___, 2008 WL 2717182, at *4 (11th Cir. July 14, 2008). See ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1462 (10th Cir. 1995)(dispute relating to an agreement that did not contain an arbitration provision submitted to arbitration where agreement was one of six joint venture agreements in oil and gas venture and other five agreements contained a broad arbitration provision; the sixth agreement

"clearly relates to the ongoing oil and gas joint ventures between the parties" and the arbitration provisions in the other five agreements are "clearly broad enough to encompass disputes with respect to the [sixth] agreement").

One such case involving two contracts, one with an arbitration provision, and the other with no arbitration agreement, is ACE Capital Re Overseas LTD v. Central United Life Ins. Co., 307 F3d 24 (2d Cir. 2002), in which the court held that an arbitration clause in a reinsurance contract, virtually identical to the arbitration provision found here, was broad enough to reach a dispute arising under a subsequent "Proposal to Enter Into Restructured Reinsurance Arrangements" entered into by the same two parties. Id., at 34; see generally Hartford Accident and Indem. Co. v. Swiss Reinsurance America Corp., 246 F.3d 219, 224 (2d Cir. 2001)(nearly identical arbitration clause in reinsurance agreement has "broad scope").  Similarly, in Nat'l American Ins. Co. v. SCOR Reinsurance Co., 362 F.3d 1288 (10th Cir. 2004), the court held that an arbitration clause in a reinsurance agreement covering surety bonds requiring arbitration of "'any irreconcilable dispute between the parties'" applied to require arbitration of a dispute plaintiff reinsured contended arose out of a second hold harmless and indemnity agreement naming the reinsurer as "co-surety" of the same surety bonds. The court held that the broad arbitration provision in the reinsurance agreement encompassed plaintiff's allegations premised upon the subsequent hold harmless agreement.  Id. at 1292.

FAIRR and FASC argue that the cases <u>Klay v. All Defendants</u>, 389 F.3d 1191, 1201 (11th Cir. 2004) and <u>Seaboard Coast Line R.R. v. Trailer Train Co.</u>, 690 F.2d 1343, 1352 (11th Cir. 1982) , in which the Eleventh Circuit held that the parties had not agreed to arbitrate the disputes at issue, are more applicable.  In <u>Seaboard</u>, the Eleventh Circuit determined that an arbitration provision in a company's "Car Contract," which established a license to member railroads to use flat cars from a company's pool of flat cars, did not reach a dispute between a member railroad and the company arising out of a subsequent lease of other flat cars created to provide a pass through tax credit.  The court stated that the "Car Contract does not profess to cover all present and future aspects of the relationship between Trailer Train [the company] and its member railroads.  It is a contract of limited application, governing only the day-to-day supply of railroad flat cars in return for which Trailer Train received a per diem rate. . . . The contract is devoid of any language suggesting that it is a general or 'umbrella' document entered into prior to developing a variety of different 'furnishing' schemes."  <u>Id.</u> at 1349-50.

In <u>Klay</u>, the Eleventh Circuit reaffirmed the proposition that even a broad arbitration clause "cannot be extended to compel parties to arbitrate disputes they have not agreed to arbitrate."  <u>Klay</u>, 389 F.3d at 1195.  In <u>Klay</u>, physicians brought a lawsuit against HMOs alleging multiple claims arising out of the HMOs' failure to reimburse the physicians for patient services.  The district court held that the

physicians' claims as "nonparticipating providers" for patient services not covered by their contract with the HMO were not arbitrable.   The Eleventh Circuit affirmed, holding that the physicians were not required to arbitrate their "non-par claims" based on services rendered outside the contracts, and refused to "expand the scope of various arbitration agreements to cover the rendition of services outside of the services contemplated by a particular contract." Klay, 389 F.3d at 1201.   Citing Seaboard, the court said that "having one contract which contains a broad arbitration agreement does not necessarily mean that arbitration can be compelled when the subject of the dispute arises from a separate contract which does not have an arbitration clause." Id. at 1201.

FAIRR and FACS also cite the recent Eleventh Circuit case Int'l Underwriters AG, 2008 WL 2717182 as support for their argument that the arbitration provision in the Reinsurance Agreement does not apply to this dispute which they contend arises solely out of the Four Placement Slips. In Int'l Underwriters, the owner, who proposed to build a cement plant in Nigeria, sued the surety for breach of a bond agreement for failing to refund $5.2 million in bond payments when the deal fell through, alleging the surety's conduct in forming the contract was a sham from the outset.   The surety moved to compel arbitration based upon an arbitration provision in a subsequent escrow agreement between the parties which "addressed the narrow issue of the mechanics for exchanging documents and funds as part of the broader agreement for

17

issuance of a financial guarantee bond." 2008 WL 2717182, at * 3.  The "principal" or "primary" agreement between the parties - the bond agreement sued upon - did not contain an arbitration provision.  The court said that the arbitration provision was in a secondary escrow agreement, entered into after the alleged "sham" conduct in connection with the bond agreement occurred; thus, the disputed conduct was not "contemplated" by the second escrow agreement.  The court found that as with the license and the lease agreements in Seaboard, the bond commitment and escrow agreement were "'separate and distinct,'" and that the escrow agreement's arbitration provision solely covered disputes arising out of the implementation of that agreement and did not reach alleged fraud and breach of the primary bond agreement.  Id. at * 3, 5.  In the words of the court: "To hold otherwise would be to let the tail wag the dog."  Id. at * 3.

Here, the arbitration provision is found in the "principal" Reinsurance Agreement between the parties, covering the reinsurance of vehicle service contracts insured by multiple obligors, including FASC.  This dispute, brought pursuant to the Four Placement Slips, "touches" on the matters to be arbitrated in accordance with Reinsurance Agreement in ways the agreements in Klay, Seaboard, and Int'l Underwriters did not.  In Klay, the Eleventh Circuit declined arbitration where the HMO's were moving to compel arbitration of claims that generated from a separate agreement for different services than the one containing the arbitration clause.  Klay,

18

389 F.3d at 1201.  Likewise in <u>Seaboard</u>, the Eleventh Circuit refused to compel arbitration based on a broad arbitration clause found in a license contract between the parties when the underlying claim was for breach of a lease subsequently entered, an agreement that had an entirely different purpose.  And in <u>Int'l Underwriters AG</u>, the court noted that the central document between the parties (which was sued upon) did not include an arbitration clause, while the secondary document entered to implement the primary document did.

In contrast, the agreements here all govern the same ongoing relationship between the same parties concerning the same subject matter and for overlapping time periods.  The Four Placement Slips "upgrade" the level of reinsurance coverage from that provided in the Reinsurance Agreement as applied to the MBPI business. Indeed, if the Four Placement Slips did not exist, Northbrook would still be obligated under the Reinsurance Agreement to provide reinsurance for FASC vehicle service contracts sold by MBPI.  Further, FAIRR treated the Four Placement Slips, providing increased reinsurance coverage for MBPI service contracts, as a "modification" of the Reinsurance Agreement; represented in state filings during the relevant time period that it had one reinsurance agreement, with separate placement slips "with a reinsurer" "on a certain block of business" providing enhanced coverage; and characterized the Four Placement Slips as providing "cut-through coverage."

Northbrook and FAIRR agreed to arbitrate "differences" relating to their

Reinsurance Agreement covering "[c]ontractual [l]iability coverage provided to Dealer Obligors and Administrator Obligors [including FASC] involved in the business of selling and/or administering Service Contracts," for the time period between January 2001 and December 2006.  Additionally, they also agreed to arbitrate differences "with reference to the interpretation" of the Reinsurance Agreement or "their rights with respect to any transaction involved."  FAIRR and FASC seek a declaration of their rights with regard to what, if any, is due and owing by Northbrook under the Four Placement Slips.  The determination that FAIRR and FASC seek as to whether the Four  Placement Slips are valid and enforceable and whether reinsurance coverage in favor of FAIRR attaches at a certain different point than stated in the Reinsurance Agreement (or the Second Placement Slips) necessarily will require interpretation of the Reinsurance Agreement, the Four Placement Slips, and the Second Placement Slips.

While the Four Placement Slips and the Reinsurance Agreement do not expressly refer to each other, that alone is not determinative of the arbitration issue here.  See Consolidated Brokers Ins. Services, Inc. v. Pan-American Assurance Co., 427 F. Supp.2d 1074, 1081-84 (D. Kansas 2006)(compelling arbitration under broad arbitration clause in one of two contracts where the contracts were related to the same subject matter, were executed on the same day and appeared to be interrelated parts of one transaction, despite the fact that the two contracts did not by their terms

refer to the other).  The broad terms of the arbitration provision do not limit those "differences" which are arbitrable only to claims brought directly under the Reinsurance Agreement.  <u>See</u> <u>Mehler v. Terminix Int'l Co.</u>, 205 F.3d 44, 50 (2d Cir. 2000).  Moreover, that the first of the Four Placement Slips may have been in place before the actual signing of the Reinsurance Agreement is of no moment.  The Reinsurance Agreement, though signed in December 2001, was made effective from January 2001 through December 2001 (the first of the Four Placement Slips was signed on May 9, 2001) and its arbitration provision reaches "differences" over the interpretation of the Agreement "or with respect to any transaction involved."[12]

The Court acknowledges that in many instances, "Placement Slips" serve as a binder for future, more formalized agreements and can be independently binding. Nevertheless, in this context, the arbitration provision in the Reinsurance Agreement is broad enough to cover this dispute  arising out of the Four Placement Slips as alleged by FAIRR and FASC.   "At worst, there is doubt as to how closely these agreements are related and any doubt must be construed in favor of arbitration." <u>NPR Group, Inc. v. Hydropress, LLC</u>, 06-60593-CIV-MORENO, 2007 WL 201259, at *4 (S.D. Fla. Jan. 24, 2007)(citing <u>Klay</u>, 389 F.3d at 1201).  It certainly cannot be said with "positive assurance" that the arbitration provision in the Reinsurance Agreement

---

[12] Moreover, the  Initial  Placement  Slip, the precursor to the Reinsurance Agreement, was executed on December 28, 2000, and contained an arbitration term. <u>See</u> <u>supra</u> p.4-5

is not susceptible of an interpretation that covers the asserted dispute. AT&T Techs., Inc., 475 U.S. at 650; see also Nat'l American Ins. Co., 362 F.3d at 1292.[13] Upon due consideration, it is hereby

ORDERED:

1.    Plaintiff's Motion To Compel Arbitration (Doc. 31) is **GRANTED**.

2.    Judgment compelling plaintiff Northbrook Indemnity Company and defendants First Automotive Service Corporation, N.M. and First Automotive Insurance Risk Retention Group, Inc. to participate in arbitration of the claims and counterclaims alleged in Case No. 3:07-cv-682-J-32TEM, pursuant to the terms of the Reinsurance Agreement, is withheld pending a settlement conference with the United States Magistrate Judge James R. Kindt.  Judge Klindt's chambers will be in touch with the parties to schedule the settlement conference.  If the settlement conference should prove unsuccessful, plaintiff should move for entry of final judgment to be entered consistent with this Order.

---

[13]   FASC and FAIRR argue that FASC is not a party to the arbitration agreement between Northbrook and FAIRR under the Reinsurance Agreement, and thus can not be compelled to arbitrate this dispute.  (Doc. 32 at 16.)  However, FASC bases its declaratory judgment action in Case No. 3:07-cv-682 upon the Four Placement Slips, though it is likewise not a signatory to them.  "Estoppel . . . may bar a non-signatory from avoiding arbitration if the non-signatory relies on a contract containing an arbitration clause."  World Rentals and Sales, LLC, 517 F.3d at 1248.  FASC is equitably estopped from resisting arbitration under the Reinsurance Agreement which provides for arbitration of claims brought pursuant to the Four Placement Slips. Becker v. Davis, 491 F.3d 1292, 1299-1300 (11th Cir. 2007).

3.      Also, consistent with this Order, the related declaratory judgment action in <u>First Automotive Service Corporation, N.M., etc. et al. v. Northbrook Indemnity Company</u>, No. 3:07-cv-682-J-32TEM is **STAYED** and administratively closed, pending resolution of the arbitration proceedings.  A copy of this Order will be filed in Case No. 3:07-cv-682-J-32TEM.

**DONE AND ORDERED** at Jacksonville, Florida, this 1st day of August, 2008.


TIMOTHY J. CORRIGAN
United States District Judge


jl
Copies to:

Honorable James R. Klindt
United States Magistrate Judge

Counsel of Record